HENRY KELLY et al. *v.* JAMES C. DAVIS et al.

1. WILL: PROBATE IN COMMON FORM: EFFECT OF.—The decree of the Court of Probates, admitting a will to probate, in common form, is not like an ordinary decree or judgment, which protects those acting under it, until it is regularly set aside ; but it is a mere incipient step in the execution of the will, and confers upon the executor, acting in good faith, the power to proceed with its execution, until he has notice of the invalidity of the will, or until proceedings are instituted to contest it.

2. SAME: ISSUE DEVISAVIT VEL NON: HOW IT AFFECTS POWERS OF EXECUTOR.—The pendency of an issue *devisavit vel non*, suspends the right of the executor to proceed with the execution of the will, so far as its provisions are inconsistent with the law regulating the administration and distribution of intestate's estates, but no further ; and hence the executor may, during the pendency of the issue, collect and pay the debts due to and by the estate, and do all other acts beneficial to the parties interested, but he cannot, except at his own risk, pay legacies or otherwise dispose of the assets, in pursuance of the will, and contrary to the law regulating the administration of intestate's estates.

3. SAME : EXECUTOR : HIS DUTIES AND POWERS IN REFERENCE TO DEFENDING THE WILL.—It is not the imperative duty of an executor to defend the validity of the will, when contested by the heirs ; he may give notice of the pendency of the suit to the legatees, if adults, and to their guardians, if minors, and decline to incur any expense on that account : or he may defend, taking the risk of establishing the validity of the will as the condition of being indemnified out of the assets in his hands.

4. SAME : SAME.—If the issue *devisavit vel non* be decided in favor of the validity of the will, the executor may pay, out of the assets in his hands, the reasonable and proper expenses of maintaining the will ; because the expenditure is beneficial to those interested ; but the rule is different where the will is set aside : in that case it not being the duty of the executor to defend the will, if he incur expenses on that account, he will not be entitled to a credit therefor, as against those heirs who contested the will.

5. SAME: SAME: RIGHTS OF EXECUTOR AGAINST LEGATEES, WHO ARE DISTRIBUTEES.—Where an executor employed counsel, and otherwise expended money, in defending the validity of a will which was set aside, and during the pendency of the litigation he paid legacies to persons who were also distributees, it was held, that on a final settlement he was entitled to charge the expenses of defending the will on the shares of the distributees who did not contest it, nor disclaim the benefits given by it ; and that his payments of legacies were advances on the distributive shares of the persons to whom the payments were made.

6. SAME: COMMISSIONS.—An executor who has paid out money improperly, but

in pursuance of a will which was set aside, is entitled to commissions thereon, inasmuch as he is chargeable with the improper disbursements as assets.

7. SAME: ISSUE DEVISAVIT VEL NON: VERDICT AND JUDGMENT.—When the verdict upon an issue of *devisavit vel non* is against the validity of the will, the judgment has relation back to the date of the pretended will, and annuls it, *ab initio:* nor will the legal effect of the judgment in this respect be changed by a recital in it, that the will is annulled " from this day hence."

APPEAL from the Court of Probates of Hinds county. Hon. John N. Robb, judge.

It appears from the return that Littleton Kelly died in Hinds county, in May, 1849, leaving a paper purporting to be his last will and testament, which was presented by Hiram Kelly, the executor therein named, to the Probate Court of Hinds county for probate, and admitted to probate, on due proof by the subscribing witnesses, and letters testamentary granted thereon to said Hiram Kelly, at the July term of the Probate Court, 1849. By this instrument, the property of the supposed testator was directed to be equally divided between his widow, Sophronia Kelly, and his children, except his dwelling house, blacksmith shop, and a negro woman, Hannah, which were given to the widow absolutely. The division, however, was not to take place until the youngest child should arrive at lawful age, and the property, in the meanwhile, was to be kept together on the farm, and managed by the executor, who was directed to apply the proceeds to the liberal support and education of the minor children, and in the purchase of other property. The testator had a granddaughter, Sarah Jane Davis, the child of his deceased daughter, Mrs. Davis. This grandchild was not provided for except by a nominal legacy of $10. The testator had a stepdaughter named Mary Priswood, the child of his wife Sophronia by a former husband, and the instrument directs the executor to maintain and educate this stepdaughter liberally out of the estate until the property is divided.

At the November term, 1849, of the Probate Court, Henry Kelly and William Kelly, children of said Littleton Kelly, who were of full age, and Sarah Jane Davis, the grandchild, by her guardian, filed their petition, alleging that said instrument was not the valid will of Littleton Kelly, their ancestor, and asking for the

issue *devisavit vel non*, to try the validity thereof, citing the executors in said will, and the legatees, Mary Priswood and others, who appeared and answered the petition. At the May term of the court, 1850, the issue was accordingly made up, and sent to the Circuit Court for trial; and after two trials resulting the same way, said will was finally declared null and void, by the verdict of the jury, and this verdict confirmed by the Probate Court, on the 7th of December, 1854. In the meantime, Hiram Kelly, by due course of law, had been removed from his office, and Baldwin H. Beauchamp appointed administrator, with the will annexed, on the 16th of May, 1850, and pending the contest about the will. Beauchamp had full notice of the contest at the time of his appointment, and employed counsel to assist the counsel previously retained by Hiram Kelly to maintain the will.

During the time between the appointment of Beauchamp, and the termination of the contest about the will, he proceeded to execute the provisions of the instrument. Sophronia Kelly, the widow, was allowed to take the slave Hannah, and other property bequeathed to her; and Mary Priswood and the minor children were supported and maintained out of the estate by Beauchamp. Mary Priswood, during this time, was a minor without a guardian, and had no property of any kind. The woman Hannah was worth $100 per year, and was in the possession of the widow for several years. Beauchamp took no steps, after the will was set aside, to recover hire from the widow, or to recover the sums expended on Mary Priswood, who is admitted to have been insolvent at the outset.

It appears that J. C. Davis and Henry Kelly became the guardians of the minor children of Littleton Kelly, and there being no means for the support of said minors pending the contest about the will, these guardians applied to the court for an increase of the allowance out of the estate, which was granted;—this allowance, however, was made in favor of persons who were entitled to the property in any event, whether the will was sustained or not, and was merely an increase on the previous allowances voluntarily made by Beauchamp.

The annual accounts were regularly passed by the Probate Court, but in the ordinary way, without notice to the heirs.

It appeared that H. Kelly, the executor, had employed Messrs.

Kelly et al. *v.* Davis et al.

T. J. & F. A. R. Wharton, and S. A. D. Graves, to defend the validity of the will, at a feé of $1500; that after his removal from office, and the appointment of Beauchamp, the latter continued them counsel, and also employed F. Anderson, at a fee of $500. It was shown that the estate was worth $40,000, and that there were three trials before juries in the Circuit Court; that these trials were tedious and laborious, and continued each about ten days. Mr. Anderson, on being examined on this point, stated, that he would not be willing to accept the same fee for similar services again, and that he thought the whole amount of the fees charged reasonable.

In 1855, the negro property of the estate was divided amongst the heirs at law. Beauchamp continued to administer the estate until 1858, and then died without having made his final settlement. By his will he appointed the appellees his executors, and they presented the final account of his administration, in which they claimed allowances for all the expenditures, including the expenditures made for Mary Priswood and the minor children, pending the trial of the issue *devisavit vel non*, and the counsel fees paid by him, and rendering no account of the hire of the slave Hannah. To this account, Henry Kelly, J. C. Davis, as guardian of Sarah Jane Davis, and others, heirs of the decedent, filed exceptions. These exceptions relate mainly to the expenditures made on account of Mary Priswood and the minors, after notice that the will was impeached, to the attorneys' fees, and to the allowance of commissions on income improperly expended.

The exceptions claim that the amounts paid to minors were improperly paid, and can only be treated, in any aspect of the case, as advancements in the nature of partial distributions; and that as the administrator, by taking his commissions out of the fund on hand, will so diminish it as to render it impossible to equalize the shares, his commissions should not be allowed to postpone those heirs who have had no advancement or partial distribution.

These exceptions were all overruled by the court, and the final account allowed, as stated, and the expenditures treated as proper, and no abatement allowed as to the shares of minors who had been supported from the estate, in favor of those who had not received anything.

The parties excepting appealed to this court.

*W. P. Harris,* for appellant.

The court below, by its decision, sustained the proposition, that after a will has been probated in the common form, or, in the language of this court, after the first probate or "incipient step," the executor may, notwithstanding the heirs at law immediately institute proceedings to set aside the will in the manner prescribed by the statute, proceed to carry out its provisions, by paying legacies, and executing provisions in favor of persons wholly irresponsible, in cases where to pay the legacy or execute the provisions, must be a total loss to the heirs in case the will is not sustained, and that he may lawfully do so after full notice of the pendency of the proceeding to set aside the will, and although he may be a party to that proceeding. In other words, though there is but one way in which the disinherited heir may by law protest against the execution of the provisions of the spurious will, and the disposal of the property of his ancestor, yet it is still in the power of the executor, at his will and pleasure, to render that protest ineffectual, by executing the will even in cases where to execute it is to render the proceeding to contest its validity a barren and fruitless proceeding. So that if a will should direct the estate to be converted into money, and paid over to a vagabond, or employed in the erection of a hospital, and the heir, the day after probate, should allege that the will was obtained by fraud and undue influence, or that the testator was insane, and the court, heeding his petition, should cite the executor, and require him to propound the will for proof before a jury on an issue *devisavit vel non,* the executor might pay over the legacy to the vagabond in the one case, and proceed to build the hospital in the other, and at the end of the contest, which may result in establishing the invalidity of the will, the executor may report to the court that he has paid over the estate to a vagabond who has squandered it, or that it has assumed the form of bricks and mortar, and receive his discharge at the hands of the court the very day that the same court proclaims the will void and the heir entitled to the estate. That this can be the law of the land, seems not only not to be doubtful, but impossible. The same statute which confers upon the court the power to admit the will to probate on the *ex parte* application, in order to save the rights of the heirs, provides a mode in which the heir may demand a re-probate, or what

is the same thing, the proof of the will in a direct issue. It is unreasonable to suppose that the executor may voluntarily and of his own mere motive, acting on his own judgment, render this proceeding to set aside the will, illusory. The suggestion that the heir might obtain relief in chancery by injunction, is to suppose a gross defect in the law, which does not exist. The heir may, out of abundant caution, if the executor has not given bond, or he is not content with it, obtain relief against his wrongful acts in a court of chancery; but the very proposition that a court of chancery would enjoin, involves the idea that it would be wrong in the executor to carry out a will, the validity of which is disputed.

The case under consideration is as strong as the cases supposed by way of illustration. Mary Priswood had no claim upon the property, unless the will was valid. She was a minor, and the provision for her involved, by its very nature, the destruction of that much of the estate—her clothing, board, and tuition from year to year. She was destitute of property, and was unable to return what she received. The payments on her account were purely voluntary; no proceeding was instituted by her to obtain them, and no order of court made, on her account. The mere passing of the annual accounts does not amount to a decree or order on the executor, and cannot protect him. The result is, that it is a naked case of a voluntary payment to a legatee, after notice that legal proceedings were pending to set aside the will, and which resulted in setting it aside.

If we were to invoke, for the protection of the executor, the general equitable doctrine in favor of trustees, still that doctrine is not broad enough to cover the case; for it requires the trustee to act with due caution, so as to protect the rights of all parties claiming the fund in his hands.

The executor in the case, where he knows that a proceeding is pending to revoke the probate and annul the will, is not bound to execute the *provisions* of the will, in favor of the beneficiaries under it. He may refuse, and no court would compel him to pay the legacies, or to assent to them, without due indemnity. If, in such case, acting upon his own judgment, and against the warning that the will, his power of attorney, is void, he voluntarily disposes of property by placing it beyond the reach of the heirs at law, it is

not the *bona fide,* the innocent and prudent act of a trustee, which ought to be excused. .

. We apprehend that no authority can be found which protects an executor in voluntarily paying a legacy, after he has notice of a proceeding, by due course of law, to revoke the probate. The cases in which such payments have been sustained are placed on the express ground, that the executor acted innocently, and without any notice of the defect in his authority. Such was the case referred to by the texts of Toller, Williams, and Lomax; of *Heel* v. *Stovel,* Ch. Cases, 126 ; and by the court in *Ralston* v. *Telfair et al.,* 2 Devereux & Battle, 414. In the last case, Judge Ruffin puts his decision on the authority of *Heel* v. *Stovel,* and upon the general doctrine that a trustee acting for others, and without notice, in good faith, under an apparent legal authority, will be protected. These authorities would certainly protect an executor who pays legacies, without notice that the will is legally contested, because by the law he is bound to pay them, if there be no contest pending in regard to the validity of the will, but they do not protect him when the statutory remedy of the heir against an invalid, forged, or spurious will is in full progress, and he a party to the proceeding. See *Wolly* v. *Clarke,* 5 Barn. & Ald. 744 ; English Common Law Rep. 249.

This general doctrine in favor of trustees has its well-defined and unmistakable limits. The court below proceeded upon a misapprehension of the state of the law and the authorities, as collected in Toller and Williams, and copied by Lomax, 2d ed., vol. 1, p. 361 to 366, in regard to the effect of a probate by a court of competent jurisdiction, which is subsequently revoked on *citation* for any cause. The doctrine laid down by these authorities, and relied on in *Peebles' Appeal,* 15 Serg. & Rawle, has well-defined limits. The probate, under such circumstances, recognizes the executor with the *general powers* of the representative of an estate. The Court of Probate having jurisdiction of the subject-matter can confer the office to which these general powers of a representative of an estate pertain, or authenticate a will which does confer the office. The payment of debts and funeral expenses, the collection of debts, and preservation of the effects, and other acts which pertain to the office of the rightful representative of an estate, are

fully authorized; because in any event, and by whomsoever the estate may be represented, and whether the decedent died testate or intestate, these acts must be performed, as required by the general law paramount.   The claims of creditors are paramount to those of the heirs and legatees, and are independent of the will; and the collection of debts due, and the recovery and preservation of the assets, a duty which pertains to any representation of the deceased.   The execution of the provisions of the will in favor of the legatees under it, is the exercise of an authority not derived from the court, and not resulting by law to the representation of an estate, but conferred by an act *in pais*, a private act in derogation of the rights which the law confers, and a mode of disposition which the law would not make.   This authority may be invalid, though the act of the court in admitting it to probate is valid. Where, therefore, those whose rights are taken away by this power of attorney, or private act, protest against its being the rule which is to govern the disposal of the property, on the ground that it is a forgery, or that it has been improperly obtained, or not executed according to law, the executor who pays a legatee cannot claim that he is doing what the *law* requires him to do, whether the authority is valid or invalid, as in case he receives a debt or pays one, or that he is satisfying demands upon the estate which are paramount to the claims of the heirs.   The legatee has no claim upon the estate founded in the law, but only a claim founded on the will, which is a private matter, and the foundation of his right is disputable.

There is an obvious distinction between those acts which depend for their authority and validity upon the law, and those which depend for their authority and validity on the will.

In the one case the authority cannot be disputed, and no protest can affect it so long as the functions of the person holding the office of legal representation remain unsuspended.   In the other case the authority may be disputed, because it depends on the existence of a valid will, and that is a matter expressly reserved for dispute.   The law is indisputable.   The existence of a valid will is disputable.   The general acts of administration, such as payment of debts, collection of debts, and preservation of the estate, acts pertaining to the office of legal representation, must be

performed by some one, whether there is a valid will or not.    The payment of the legacies can only be right, provided there is a valid will.    It will be found, from an examination of the cases in Williams and Toller, and Lomax, and the case of Peebles' Appeal, are cases in which the acts sanctioned are those of general administration, depending for their validity on the general law and not on the will.    The statute preserves to the heir the right to contest the will, but not the acts of the administrator or executor in the performance of general duties of the office.    It would be absurd to hold that it has preserved this right to dispute the authority to pay legacies, and yet leave the executor at liberty to exercise it, to the utter destruction of the estate.

We may concede that, in a court of equity at least (though the case of *Sandford* v. *Garner*, 12 S. & M. 558, seems to hold a contrary doctrine), until the executor has notice of the proceeding to set aside the authority under which he acts, he would be excused if he pays legacies, though the will should prove to be invalid. The payment is not valid so as to give title to the legatee, but if loss results to the heirs, the executor, like any other trustee, would be excused on the ground that he acted innocently, without notice, and under an authority apparently valid.

There are two propositions relied on to support the payment of legacies after notice that the heir has commenced proceedings to invalidate the will.    1st. That the probate is a decree of a court of competent jurisdiction, valid and conclusive, until reversed or set aside, and all acts done under it will be upheld.    2d. That the probate establishes the will as a valid will, and the will is the law to the executor.

To these propositions there is one sufficient answer.    The probate in common form, at the instance of the executor without notice to the heir, is not a definitive judgment.    The statute fixes its character as a mere "incipient step," not final and conclusive as to the rights of the heir and the legatee.    It differs from a judgment in a contested cause, final in its nature, and conclusive until reversed. The statute declares it to be inconclusive until after the lapse of five years.    It may be conclusive as to the title of the executor to the office, and is conclusive in any controversy *between him and third persons*,—in any suit brought by him by virtue of the office

he holds; but as between the heir not a party, and the legatee, it is not conclusive. *Cowden* v. *Dobyns*, 5 S. & M. 82. And cannot be from the nature of things, for no judgment can conclude one not a party to it, and the heir is not a party to the probate. It differs from the case sometimes cited, of an administration granted, and an order of the Probate Court to sell lands for the purpose of the administration, and a sale under such order *duly confirmed*, and the subsequent discovery and probate of a will. The order of sale and sale confirmed, is a definitive sentence of a court of competent jurisdiction,—such sale is held to be valid in favor of purchasers without notice; but it is obvious that, at any time before the sale is complete by confirmation, the discovery of the will would arrest the proceedings.

The meaning of the phrase, " the will is the law to the executor," is this, that he is to follow the will in the disposition of the estate, and not the law of distribution; but an invalid will cannot be valid to the executor, and the probate of it is not conclusive of its validity: the statute supposes that it may not be valid. When the proceeding, authorized by the statute, to compel a solemn and definitive probate, or to invalidate it, is commenced, the executor or administrator, as between the legatee and the heir, is a mere stakeholder. The proceeding by the heir is a formal and substantial protest against the payment to the legatee, and if the executor pays after this protest, he pays at his own peril. Any other doctrine would subvert the rights expressly reserved to the heir by the statute.

The difference between the final judgment of a court of competent jurisdiction in a contested suit, or a suit between parties, and the authentication of a will, without notice to the heirs, under the statute reserving to the heirs the right to require solemn proof on an issue *devisavit vel non* (especially where the heirs have obtained an order from the court which in effect recognizes the inconclusive nature of the *ex parte* authentication), is so essential, that to attempt to run a parallel between them, and to compare the will thus authenticated to an execution in the sheriff's hands, seems to be absurd. The suit has, for its object, the final settlement of disputed rights, and by law and common consent, the final judgment in it is a conclusive settlement of rights. The *ex parte* authentication of a will, however, is not designed to settle rights, but merely to enable the

Kelly et al. *v.* Davis et al.

executor to represent the deceased, while the question of right between the heir and legatee is reserved to be settled in the manner pointed out by the statute. The probate does not establish the rights of the legatees: it is but an assertion of them. The writ in the sheriff's hands, notwithstanding there may be error in the judgment, is of the same authority as though the judgment was without fault, because it is the execution of a final sentence of a court having power to render it. The writ is valid, and a writ of error does not question its validity; but the will probated is still subject to be questioned in the same court, and the authentication is merely preliminary, and so far from having within it anything of a conclusive nature, the probate is the starting-point or foundation for the proceeding in which the heirs are heard to dispute the title set up by the probate, which is merely the first step of legatees, and the executor in asserting a right, which assertion can have no recognition until this "incipient step" is taken. To claim for the will, which is the executor's authority, the absolute validity of an execution under a definitive sentence, and to give to it the effect of a mandate to an officer to execute the sentence of a court in a suit between parties, conclusive and final in its nature, is to destroy the distinction between final judgments and preliminary and incipient orders, and to put what is, in fact, a mere power of attorney, which the executor voluntarily accepts as a trust, a private act, on the footing of a judicial mandate. For the will is but a power conferred by an individual as to the executor; and, as to the legatees, it is merely a grant by an individual, and the probate is its authentication. When it is impeached in the manner prescribed by law, the power of the executor to pay legacies, and the right of the legatee to claim, are both arraigned, and the power cannot be held to be unrestricted and irresponsible unless the right of the legatee to receive is perfect and indisputable.

The law gives to the defendant, in a final judgment, the right to suspend the execution, because execution is the inevitable result without suspension, and the court which pronounces judgment has no power over it; but it was not thought necessary to give this remedy to suspend a will contested after a mere formal authentication, because that was not final. The executor, carrying out the will of an individual, is responsible to those who dispute it. He

may decline to incur it. He accepts a trust he is not bound to accept, and stands as an ordinary trustee. The sheriff, however, is bound to obey. His writ leaves him no discretion.

The case of *Wood's Administrator* v. *Nelson*, reported in 9 B. Monroe, 600, and again in 10 B. Monroe, 229, is perhaps the strongest authority in support of the validity of the acts of the executor, prior to notice of the invalidity of the will, so far as such acts pertain to the office of executor or administrator, and yet it is a conclusive authority in favor of the position of the contestants here. In that case a will had been admitted to probate—there was a sale of lands by the executor, and of certain slaves. The lands were sold prior to notice of a proceeding instituted by the heir to set aside the will, but were not paid for at the date of the decree annulling the will. The slaves were sold before the executor had been served with citation in the proceeding to vacate the will, but he distributed the proceeds of the sale to legatees after notice, and before the decree annulling the will. The court set aside the sale of the lands, and then charged the executor with the proceeds of the sale of the slaves, and refused to give him commissions on the amount thus received by him, and wrongfully disbursed. The court admitted that the purchaser of the slaves from the executor was protected, and that the purchaser of the lands would have been if he had paid in good faith.

This case is worthy of notice on another point. The purchaser of the slaves was a creditor of the estate to the extent of part of the purchase-money, and the court held that so much of the proceeds of the sale as went in discharge of this debt should be credited to the executor, as it went to a party lawfully entitled to it, and to pay off a debt.

In this case (the one at bar) part of the wrongful expenditures went to some of the distributees lawfully entitled to a share of the income of the estate, and the court below might properly treat them as partial advances in disposing of the fund remaining in the hands of the executor, and in the decree which must be rendered in this case in favor of the contestants.

It is worthy of notice in another point of view. The executor claims commissions on the income, the proceeds of the farm,—4 per cent. All these proceeds were wrongfully disbursed. There is

Kelly et al. *v.* Davis et al.

but a small amount left in his hands: the claim is to tax what remains, after these wrongful disbursements, with commissions on the amount wrongfully disbursed, or the amount received and wrongfully squandered. The case cited is a direct authority for the position that commissions should not be allowed on the amount thus disbursed ; and in this connection it may be observed, that the case of *Brandon* v. *Hoggatt*, 32 Miss. 335, is an authority that, so far as the claims of Sarah Jane Davis are concerned, she having received nothing but her share of the slaves, the executor is bound to put her on an equal footing with the other heirs, and no claim for commissions can be interposed to defeat her claim, since it was by the voluntary act of the executor, with full notice of the consequences, that the funds have been withdrawn to such an extent as to bring the claim for commissions in conflict with hers. The same may be said of Henry Kelly, and others in like situations.

The account should charge the executor with all the improper expenditures made pending the issue *devisavit vel non*, and a decree go for what is the share of Sarah Jane Davis and Henry Kelly of the income, and the claim for commissions to stand, if at all, against the expenditures made for the other distributees. In other words, the executor cannot diminish a distributive share, and turn the distributee over to a suit to get the deficit out of third parties. He must take the responsibility of these parties himself.

The counsel fees contracted by Hiram Kelly, amounting to $1800, and contracted for by Beauchamp, amounting to $600 more, are not a charge on the estate ascertained to belong to the heirs.

There are one or two cases which sanction such a charge, but the weight of reason and authority are against it.

It will be observed that all the legatees were parties to the proceeding to set aside the will ; the executor and legatees joined in the answer to the petition, and asserted the validity of the will. The general rule is, that the trustee cannot tax the trust estate for anything not beneficial to it, and for no expense attending it, unless his title, or that of his *cestui que trusts*, is upheld. There is nothing which in principle exempts the executor from this rule. It was the privilege of the legatees to retain counsel. It was the

duty and the privilege of the executor to require them either to employ counsel or to indemnify him.

Counsel fees are always proved to be reasonable, however large, and it is monstrous to hold that an executor, often stimulated by mere desire of victory, should be allowed unlimited authority to tax the estate belonging to those whose rights he withholds with the expense of the war.

As to Anderson's fee, it is not shown to have been at all necessary, however able and efficient he is admitted to be. Counsel deemed by one executor, and by everybody else, amply sufficient, three in number, had been retained, and Beauchamp, on his own judgment or views, retained another at a high fee. The courts must impose some check. Upwards of $2400 were paid to counsel, and about as much in the shape of costs.

The following authorities are cited as being full on the point of the exception, and conclusive in reasoning. Chancellor Harper, in 1 Bailey Chancery Reports, 669; 3 Watts & Serg. 441; 13 Penn. State R. 569; 7 Ohio State Rep. 143. The last case is a review of the authorities on the question, and is very satisfactory on the whole subject. It is not easy to perceive why rules of law, applicable to other trustees exercising authority, the validity of which is impeached, should be relaxed in favor of persons intrusted with the management of estates of deceased persons,—why notice should not bind them as it does other trustees. Certainly, in view of the fact that dead men's estates are considered as fair game, and liable, through a loose administration of the law, to waste and destruction, it cannot be good policy to enlarge the discretion of administrators, and relax the law which makes them responsible.

There has been no waiver or assent, express or implied, on the part of the contestants. It is their privilege to elect to charge the executor with the proceeds of the plantation, and not for hires and rents; but this election, although it may consist with a provision of the will, was clearly not a recognition of it, or a consent that its provisions should be carried out, or that the proceeds of the plantation should be expended under its provisions, for this was the very pith and marrow of the controversy. The administrator and former executor had been defraying the expenses of the minors, and when guardians were appointed, they complained that as an allowance under the will, it was insufficient, and if the administrator under-

took, against their protest, to provide for the minors, the provision ought not to be illusory.

The naked question therefore arises here, unembarrassed, and calls for decision at the hands of the court, whether the authentication, *ex parte*, of a will, justifies an execution in carrying out its provisions in the face of the proceeding to set aside the will, and which proclaims the will to be void.

*T. J.* and *F. A. R. Wharton*, for appellees.

As the main questions arising under the first, third, fourth, and sixth exceptions to the final account of appellee's testator, as administrator of Littleton Kelly, rest upon a common ground of objection, we will consider these in connection. Before doing this, we will notice the questions raised by the second and fifth of these exceptions.

The second exception is, that the administrator was not charged with a higher rate of interest than 6 per cent. on the balances due on his several annual accounts.

The rate of interest charged in the account is that prescribed by our statute and this court. Hutch. Code, 643, arts. 6 & 7; *Wheeler* v. *Brew, Executors*, 33 Miss. Rep., 4 Geo. 126.

The fifth exception is to the basis upon which commissions were allowed the administrator, and also, to the rate at which they were allowed.

The record shows that this allowance was made at the rate of 3 per cent. on the principal, and at 5 per cent. on the income of the estate administered by Beauchamp; it also shows that a commission of 4 per cent. on the value of the principal of the estate administered by him was allowed to Hiram Kelly, on the final settlement of his accounts as executor of said L. Kelly, p. 38.

This was within the rule prescribed by our statute and the decisions of this court. Hutch. Code, 488; *Satterwhite* v. *Littlefield*, 13 S. & M. 302; *Spratt* v. *Baldwin*, 33 Miss. Rep. 581; *Merrill* v. *Moore*, 7 How. 271; *Shurtliff* v. *Witherspoon*, 1 S. & M. 613; *Cherry* v. *Jarrett*, 25 Miss. Rep. 221.

The exception to the basis on which these commissions were allowed is not sustained by any evidence disclosed by the record. There is not any evidence tending to show that the values of the

principal and income of the estate administered by Beauchamp were less than those upon which commissions were allowed. The fact that the basis of the principal of the estate, on which commissions were allowed, exceeds the amount of the value of the property specified in the inventory, does not show that the Probate Court erred in estimating the principal of the estate. This would only tend to show, in the absence of all the other facts and evidence which was before that court, that this inventory did not contain all the principal of the estate administered by Beauchamp. The record does not show what evidence, if any, was offered in support of this exception; but it shows that, for another purpose, proof was offered that the negro woman Hannah, referred to in the first exception, was not included in the inventory.

Under this state of case, we submit that this court must presume there was evidence before the Probate Court that Beauchamp administered other property besides that embraced in the inventory and the proceeds of the crops, &c., and that commissions were allowed him on a proper basis therefor. *Duncan* v. *McNeill*, 31 Miss. Rep. 2 George, 705; *Hutchins* v. *Brooks*, Ib. 430; *Carpenter* v. *Booker*, 33 Ib., 4 George, 45; *Oliver* v. *Walton*, Ib. 103.

But it is said this income was from a source not contemplated by law, and was occasioned by an unauthorized application of the property of the estate.

The record shows it was from sales of crops, for a series of years, cultivated on a plantation, in pursuance of the provisions of the will.

We think it a sufficient reply to this objection to say that, even if this income arose as stated in the exception, the Probate Court could not refuse to allow a commission on this fund, unless the heirs had refused to accept the proceeds of such sale. *Billingslea* v. *Young*, 33 Miss. Rep., 4 George, 95.

If that court had required Beauchamp to account for the hire of the negroes who cultivated these crops, he would have been entitled to commissions on such hires. Upon what principle, then, could it have refused to allow commissions on the sales of the crops we cannot imagine. But whether or not this income was occasioned by an unauthorized application of the property of the estate will

depend upon the adjudication of the remaining exceptions, and we shall discuss it in connection with them.

We now proceed to notice the remaining exception.

We submit that the record in this case shows that each and every act of Beauchamp, objected to in these exceptions, was done by him in good faith, and in pursuance of the provisions of a will which had been duly admitted to probate by a court of competent jurisdiction, acting within the scope of its jurisdiction by a decree from which no appeal had been taken, and before it was revoked, and that he was entitled to the same protection as to such acts as though the validity of the will had never been a subject-matter of contest.

Although this particular proposition does not appear to have been adjudicated by this court, nor by courts of the other States of the Union, in but few cases, yet we think it will be found that the principles of law upon which it rests, have been frequently recognized by this and various other appellate courts in the United States, and is sustained by the weight of authorities.

This court has decided that " there is no principle more fully recognized in our jurisprudence than this, to wit: the judgments of a court of competent jurisdiction, acting within the scope of its jurisdiction, is binding and conclusive upon all the world, until its judgment has been reversed, or set aside by itself or some superior tribunal having authority for that purpose." *Ex parte Adams*, 25 Miss. (3 Cushm.) Rep. 883; *Gildart's Heirs* v. *Starke*, 1 How. 450, 454; *Herrington's Exors.* v. *Herrington*, Walker's Rep. 322.

We think we can, upon these authorities and the provisions of our statutes,—Hutch. Code, 651, sect. 29, 30; Ib. 652, sect. 33; Ib. 654, sect. 37–39; Ib. 656, sect. 55; Ib. 675, art. 8, sect. 2; Ib. 677, art. 12, sect. 1; Ib. 661, sect. 88; Ib. 665, sect. 91,—expect from this court the protection claimed by appellees for the various acts of their testator which are made the subject-matters of these exceptions. This statute virtually abolished, if indeed it ever prevailed in this State, the probate of a will in the common form, or form per law; and restricts the courts of probate to the probate of wills in the mode recognized in the English courts, as probate in the solemn form, or *per testes*. It provides, that " when any will shall be exhibited to be proved," the court may proceed imme-

diately to receive the probate thereof, and grant letters testamentary. If, however, any person interested shall, within five years afterwards, after the grant of probate, desire to contest the validity of the will, an issue shall be made up for this purpose, and tried before a jury, &c. And a like period is allowed to *femes covert,* infants, persons *non compos mentis,* &c., after the removal of their respective disabilities to demand such issue to be made. Ib. 651, sect. 29–30.

Before grant of letters testamentary or of administration, with the will annexed, the executor or administrator c. t. a., is required to take an oath to perform the duties and trust provided for in the will. Ib. 652, sect. 33. After the probate of the will, an administrator *ad colligendum* cannot be appointed. Ib. 652, sect. 37.

These also provide, that if letters of administration be granted, and a will for the disposition of the estate of the deceased shall afterwards—no limit of time being provided for this—be proved, according to law, and letters testamentary thereof granted, such last grant of letters "shall be construed as a revocation of the letters of administration, provided, nevertheless, that all acts done by an administrator or administratrix, according to law, before any actual or implied revocation of the letters of administration, shall be valid and effectual." Ib. 656, sect. 55.

Under these statutes various acts may be done, according to law, which might be repugnant to the provisions of a will, and defeat such provisions, which might be proved, according to law, after such grant of administration. We will refer to but a few of these, however.

He may sell lands "in preference of slaves." Ib. 675, art. 8. He may sell slaves for a more equal division, &c. Ib. 661, sect. 82. He may distribute the estate after the expiration of twelve months from grant of letters of administration. Ib. 665, sect. 91.

We submit that the principle established by this statute, declaring all acts of administration done before probate of an after-discovered will, "shall be valid and effectual," must apply with equal force to all acts of an executor or administrator, with the will annexed, done in good faith and in accordance with the provisions of a will which has been duly admitted to probate, and before the decree of pro-

bate is annulled, and must operate to the entire protection of appellee's testator in the respects complained of in these exceptions.

We submit that this position assumed by us is also sustained by the following authorities: Toller on Executors, top page 72–75, mar. page 77; top page 127, mar. page 129; 1 Lomax on Exors. and Admrs. 200, 201; *Herrington's Exors.* v. *Herrington*, Walker's (Miss.) Repts. 322; *Poag* v. *Carrols*, Dudley's L. & E. Repts. (S. C.) 1; *Bradford* v. *Boudinot*, 3 Wash. C. C. Repts. 122; *Benson* v. *Rice & Byers*, 2 Nott & McCord. (S. C.) Repts. 577; *Peebles' Appeal*, 15 Serg. & Rawle's Repts. 39; *Worth* v. *McAden*, 1 Dev. & Bat. (N. C.) Eq. Rep. 199; *Hyman* v. *Gaskins*, 5 Iredell (N. C.) Rep. 267; *Allen* v. *Douglass*, 1 Term Repts. 122, in 3d vol. of Dunford & East's Repts. top p. 60.

In *Poag* v. *Carrols*, it was decided that the probate of a will, as long as it remains unrepealed, "gives the executor full power to receive and dispose of the effects according to the provisions of the will. That it would be a reproach to the law if it would not vindicate its own judgments where a party, acting *bonâ fide* under them, claims their protection. To make executors personally liable for all property they have parted with, under a will pronounced valid at the time, would lead to frightful consequences; and if such should be the case, they might as well act without probate as with it. It would destroy all confidence in the judgments of courts." "Such a case is very little different from that of a sheriff selling property, under a void judgment, to one who was a party to the fraud. . . . In such case the title would not pass, but the sheriff would not be held personally liable, being an innocent agent of the law, and no party to the fraud." *Allen* v. *Douglass*, 1 Term Repts. *ante*, is to the same effect.

In *Bradford* v. *Boudinot*, it was decided that an executor who has "received letters testamentary upon a will regularly proved before a competent tribunal, was authorized to perform all those acts which an executor has the general power to perform, notwithstanding the pendency of a litigation respecting the validity of the will." In such case, the executor is not only authorized, but it is his duty, to support the decision of the court in favor of the will; and he is entitled to the aid of the estate to discharge all reasonable

costs and expenses incurred on that account, and also to compensation for his management of the estate.

In *Benson* v. *Rice & Byers*, a sale of lands by an administrator was adjudged valid under this state of facts. The ordinary set aside the probate of a will, and granted letters of administration on the estate of the deceased. The lands were sold by the order of the ordinary. Five years afterwards the ordinary reversed his order setting aside the will. The court say : " No fraud is alleged on the part of the administrator. . . . . If administration be regularly granted, and afterwards, for cause, repealed, all lawful acts by the first administrator remain good ; so if administration be regularly granted to him to whom it does not belong, and afterwards repealed upon a citation, all acts by the first administrator are good, as if he give the goods of the intestate to another." . . . . " Any other doctrine would be fraught with the most monstrous inconvenience. The community who are not under the authority of judicial power should be certain of protection in their rights."

In *Peebles' Appeal*, the court recognizes the rule of law as stated in *Benson* v. *Rice & Byers ;* and Chief Justice Tilghman exposes the error of Toller when, on page 77 of his work on Executors, he says, that in case of revocation of the probate of a will, " all the intermediate acts of the executors shall be void ;" and shows that he contradicts himself.

In determining what acts of an executor, done during a controversy about a will, are valid, much depends upon whether they were done pending an appeal for the probate of the will, or pending a contest arising under a citation to the executor to contest the validity of the will, after a decree for its probate. Many acts which would be void if done pending an appeal, might be valid if done pending the latter form of contest. Toller on Executors, top page 127, mar. do. 129 ; 1 Lomax on Executors and Administrators, top pages 200, 201.

If we are correct in this position, the Probate Court was bound to extend its protection to Beauchamp against the various grounds of objection embraced in these exceptions, unless its decree admitting Kelly's will to probate, and granting letters testamentary thereof, was suspended during the time these acts were done by him.

Our statutes provide that decrees of Probate Courts may be suspended by appeals to this court, upon the execution of the proper appeal bond. Hutch. Code, 648, §§ 13, 926, art. 4, § 2. If this can be effected by any other means, under our system of jurisprudence, we submit it must be by injunction from a court of chancery.

Certainly our statutes do not provide that the mere acts of filing a petition to contest the validity of a will, and service on the executor of a citation to show cause why an issue to test its validity should not be made up and tried, shall operate as a suspension of the decree of probate and grant of letters testamentary. Such a provision would have enabled an irresponsible person to suspend the solemn decree of a court possessing competent jurisdiction in the premises, upon a mere suggestion that he is an interested party, and that the will is invalid. Under these statutes, neither the filing of a bill of review to a decree of a Probate Court, nor an appeal from such decree, will suspend the operation of such decree, unless the complainant or appellant should also execute a proper bond. *Denson, Admr.* v. *Denson et al.*, 33 Miss. Rep. 560.

Doubtless it will be contended for appellants, that the filing of such petition, and suing out such citation, are proceedings analogous to caveats against the probate of a will under the rules of practice in the ecclesiastical courts of England, and suspend a decree of probate of a will and grant of letters testamentary based upon our statutes. In reply to this, we submit that our statute abolishes, rather than recognizes, the right to file such caveats. They provide for an immediate probate of a will and grant of letters testamentary, whenever the will shall be submitted for probate, and give to persons interested a right, at any time within five years thereafter, to contest the validity of the will, upon petition for an issue to be made up for this purpose. Hutch. Code, 651, § 29.

Toller, on page 72 of his work on Executors, says: " When the will is opposed, it is the practice to enter a caveat in the Spiritual Court to prevent the probate. And it is said that, by the rules of that court, the caveat shall stand in force for three months, and that while it is pending probate cannot be granted ; but whether the law recognizes a caveat and allows it so to operate, or whether it does not regard it as a mere cautionary act by a stranger to

prevent the ordinary from committing a wrong, is a point on which the judges of the temporal courts have differed."

It is manifest from this that there is no analogy between these modes of procedure,—caveats being to prevent the court from probating a will, while the mode prescribed by our statutes is to contest the validity of a will after a decree for its probate has been made by a court of competent jurisdiction. If these modes are not analogous, the English rule of practice is virtually abolished by our statute. *Denson, Admr.* v. *Denson et al.*, supra.

Neither of these modes of procedure suspends the operation of a decree of a court. At most, the court can but delay or prevent the rendition of a decree of probate.

It is the duty of an executor to defend any contest involving the validity of the will, and he is entitled to credits for the payment of the costs and expenses incurred in doing this. *Brown* v. *Gibson*, 1 Nott & McCord S. C. Rep. 326; *Bradford* v. *Boudinot*, 3 Wash. C. Ct. Rep. 122; *Spencer* v. *Moon*, 4 Call. Va. Rep. 423 to 429; *Scott's Estate*, 9 Watts & Serg. 98, on p. 102; *Ralston, Admr.* v. *Telfair*, 2 Devereux & Battle, 414.

The duties of an executor, resulting from the nature of his trust, devolve upon an administrator with the will annexed, when the authority is not necessarily connected with a personal trust and confidence reposed in the executor. *Farwell* v. *Jacobs*, 4 Mass. Rep. 634; Black. Comm. Book 4, mar. 504, 507; Hutch. Code, 652, § 33.

It is insisted that the allowances made by the Probate Court to Beauchamp, on his annual accounts, for payments for the education and support of Mary Priswood and the minor children of L. Kelly, should be set aside, because he did not take any legal steps to compel these persons to refund such advances, nor any security from the guardian of Mary Priswood for refunding the money so expended for her.

The record shows that she was a minor, without any property or legal guardian. To have required such security would, in effect, have deprived her of all the benefits provided for in the will, and at a time when the decree admitting it to probate was in full force. Besides, the only refunding bond the statute authorizes an execu-

tor or administrator to take from a legatee or distributee, would not have secured the repayment of these expenditures, as this only provides for refunding "a due portion of the debts or demands which may afterwards appear against the deceased, and the costs attendant on the recovery of such debts." Hutch. Code, 665, §§ 91, 92; *Cole* v. *Leak*, 31 Miss. Rep. ; 2 George, 131.

On the final settlement of the administrator, the court was bound to grant commissions, at from 1 to 7 per cent. on the estate administered. Hutch. Code, 488.

The facts in this case differ widely from those in *Brandon* v. *Hoggatt*, 32 Miss. Rep. 335, and we submit that the rule established in that case should not govern in this. In that case the executor was claiming his entire commissions out of a single legatee's share of the estate, which share he had improperly delayed to pay. In this case, the commissions were allowed on funds in which all of the distributees were interested.

These expenditures having been made by Beauchamp, under the provisions of a will duly admitted to probate, and before this was annulled, he is entitled to the same protection therefor, which a sheriff, acting *bona fide*, would be for acts done under a void execution. *Poag* v. *Carrolls*, 1 Dudley's L. & E. Rep. 1,

In addition to the authorities we have cited in support of the main position assumed by us, with regard to the several exceptions, we rely, also, for protection to appellees' testator against the acts embraced in these exceptions, upon the decree of the Probate Court which revoked the probate of the will. This declares that said will "be and the same is hereby set aside, annulled, and held for nought from this day hence." Record, 30–31.

We submit that this recognized as valid all acts which had been done by Beauchamp *bona fide* and in pursuance of the provisions of the will. If the parties who opposed the validity of this will were dissatisfied with this decree, they should have prosecuted an appeal therefrom to this court; and, failing to do this, they are precluded from objecting to such acts of Beauchamp as would be valid if the will had not been contested. Beauchamp could not act otherwise than he did, in the respect complained of in these exceptions. He acted under the directions of a will duly admitted to probate by a court of competent jurisdiction, and upon a subject

specially confided to its jurisdiction by the Constitution of this State, during a time when its decree was not suspended, and under an oath imposed upon him by the laws passed in pursuance of this Constitution. The Probate Court could not interfere for his protection by suspending the operations of its decree, as it had no power left within its jurisdiction in this particular after it passed its decree for probate, which was not appealed from. Beauchamp was powerless, except to act in obedience to the decrees of probate and grant of letters of administration, and the directions of the will. He could not ask the aid of a court of chancery to suspend the operations of these decrees, and to enjoin himself from discharging the duties he had taken an oath to discharge. If a court of chancery could have interposed its aid at all in such case, it could only have been on the application of those who were opposed to the execution of the provisions of the will.

Finally, under this state of case, we submit that Beauchamp was entitled to the measure of protection we have claimed for him, which is,—as full protection as he would have been entitled to claim from this court as if the validity of the will under which he acted had never been the subject-matter of contest. In the language of the Supreme Court of South Carolina, in *Poag* v. *Carrolls*, and *Benson* v. *Rice & Byers*, *ante*, " any other doctrine would be fraught with the most monstrous inconvenience;" and " it would be a reproach to the law, if it would not vindicate its own judgments, when a party acting *bona fide* under them claims their protection." We submit, therefore, there is no error in the decree of the Probate Court, and that it should be affirmed.

HANDY, J., delivered the opinion of the court.

This case is brought up by appeal from a decree of the Court of Probates of Hinds county, disallowing exceptions taken to the final account of Baldwin H. Beauchamp, administrator, with the will annexed of Littleton Kelly, deceased.

The facts necessary to be taken into view in considering the errors insisted upon by the appellants, are in substance as follows:

At July term, 1849, of the Court of Probates of Hinds county, a paper writing, purporting to be the last will and testament of

Littleton Kelly, late of that county, deceased, was admitted to probate, on the application of Hiram Kelly, the executor named therein, to whom letters testamentary were then granted. This instrument directed that his entire estate should be divided equally between his widow and his seven named children, except his dwelling-house and lot, and blacksmith shop and lot, and a slave Hannah, which were given to his widow absolutely; that his estate should be kept together by his executor until his youngest child should become of age, and managed to the best advantage, and after paying annual expenses and maintaining and educating liberally the minor children until their majority, the balance of the proceeds of crops to be applied to the purchase of property at their discretion, for the interest of his heirs, and to be equally divided between his heirs, except the sum of ten dollars given to his granddaughter, Sarah J. Davis; that his step-daughter, Mary Priswood, be liberally educated and supported out of his estate until her marriage or a division of his estate. At November term, 1849, Henry Kelly and William Kelly, two of the children of the deceased, and Sarah J. Davis, a grandchild, filed their petition in the same court, denying the validity of the will and praying an issue of *devisavit vel non* to be made, citing the executor and Mary Priswood and the legatees, and the following children of the deceased, James Kelly, La Fayette Kelly, John Kelly, and Littleton Kelly, and Franklin Kelly, who appeared and answered the petition; and at May term, 1850, an issue was made up and sent to the Circuit Court to be tried; and about that time, and pending the contest, Hiram Kelly was removed from his office of executor, and, on the 16th May, 1850, letters of administration, *with the will annexed,* were granted to Beauchamp, who defended the suit and employed and paid counsel, and also paid the fees of those employed by Hiram Kelly. The verdict was against the will, and on the 7th December, 1854, it was set aside and annulled by decree of the Court of Probates. Pending this litigation, Beauchamp proceeded to execute the provisions of the will, and permitted the widow to have possession of the slave Hannah, until the end of the suit, without collecting hire; and Mary Priswood, a minor, and without property or guardian, and the minor children of the deceased, were supported and maintained by him out of the estate; and he took no steps, after the will was

set aside, to recover hire for the slave Hannah, worth one hundred dollars per year, from the widow, or the sums of money expended for Mary Priswood, nor did he take any bond to secure him for these expenditures, or for refunding the same. During the contest in relation to the will, he kept the property together, according to the provisions of the will, and made crops; and, in the year 1855, the slaves were divided among the distributees under the authority of the court. Beauchamp continued to administer the estate until his death, in the year 1858, having returned divers annual accounts to the court, but without making a final settlement of the estate. In September, 1858, the appellees, his executors, filed their petition for an account and final settlement of his administration, exhibiting their account, and claiming allowance for all the expenditures in execution of the will, pending the issue of *devisavit vel non*, including moneys paid for Mary Priswood, and for the minor heirs, and for counsel fees in the litigation, and rendering no account for the hire of the slave Hannah. To this account exceptions were filed by Henry Kelly, Sarah J. Davis, James Kelly, La Fayette Kelly, and John G. Kelly, on the ground that these expenditures should not be allowed, and that the administrator was chargeable for hire of the slave Hannah, and objecting to the allowance of commissions to the administrator, because the sum upon which commissions are claimed exceeds the inventory and the receipts properly in the hands of the administrator. These exceptions were overruled, and the account allowed, and commissions were allowed at the rate of three per cent. on the principal and five per cent. upon the income of the estate administered by Beauchamp. And from that decree this appeal is taken.

The first and principal question presented for decision is, whether, after a probate of a will in common form, in the Court of Probates, and a grant of letters testamentary or of administration, with the will annexed thereupon, and when an issue of *devisavit vel non* is duly made according to the statute, and is pending, such executor or administrator, having full notice of that proceeding, will be justified in distributing legacies pending the litigation, and in proceeding to execute the provisions of the will, which are different from what would be the disposition of the property without the will, if the issue should be decided against the validity of the will; and

whether he will not be responsible, under such circumstances, to the distributees, for any loss which they may sustain by reason of his proceeding to execute the will.

In determining this question, we have to consider, 1st, the nature and extent of the powers of the executor, derived from such probate of the will and the grant of letters; and, 2d, the effect which the pendency of the issue of *devisavit vel non* has upon the exercise of his powers.

1. The probate and letters confer upon the executor or administrator, with the will annexed, *a power* generally to act according to law in relation to the estate. He is a trustee for the benefit of the estate and of those interested in it, and, as such, he is bound to act in good faith, and so as not to prejudice or jeopard the rights of those interested. Having the authority of the court possessing jurisdiction to confer power upon him to act in the administration of the estate, he may generally act upon that authority in the performance of such duties as are warranted by law; and he may, at all events, do all such acts as are beneficial to the estate, such as preserving the estate, collecting the debts, paying the debts, &c.: for these acts are beneficial to the parties interested whether the will be valid or not. But his powers are held in subordination to the authority of the court from which his letters proceeded, subject to its direction and control. Hence, though he has general authority to execute the will, he is bound by the orders and proceedings of that court touching the performance of his duties in that respect.

There appears to be but little analogy between his position and that of a sheriff acting under an execution. The writ *commands* the sheriff to do a specific thing, leaving him no discretion whether he will or will not do it; but the letters merely confer *power* upon the executor, with a large discretion as to its exercise, and upon the plain trust that it is not to be exercised to the prejudice of those interested in the estate, except upon positive authority. The sheriff is justified in acting upon an execution, though it be afterwards set aside for irregularity; but the party to the judgment is not justified. The executor is the party obtaining the probate, and is not justified for acts done under it, especially after notice of its invalidity. *Woolley* v. *Clark*, 5 Barn. & Ald. 744. As a trustee he

is bound to look to his authority, and to take heed to the exercise of his powers whenever he has notice that the will is called in question, in due form of law. His authority, derived from his letters, it is true, is to execute the will. But when that is contested, in a mode prescribed by law, it is the part of prudence on his part, and justice to those interested as distributees, to pause.

2. The effect of the issue of *devisavit vel non* plainly is, to suspend such acts of execution of the will as will operate to the prejudice of the distributees, in the event that the result of the proceeding be to set aside the will.

The first probate of a will in this State is substantially after the same manner, and with the same effect, as the probate in common form in England; and it has been repeatedly held by this court, that such probate is a mere incipient step, necessary to enable the court to take steps to carry it into execution, but that it is not conclusive on heirs and distributees. *Hamberlin* v. *Terry*, 7 How. 143; *Cowden* v. *Dobyns*, 5 S. & M. 82; *Garner* v. *Lansford*, 12 Ib. 558. The statute prescribes the mode in which the heir or distributee shall proceed to impeach the will. It is to be done in the same court in which the probate was granted, and the issue to try the validity of the will is made up by that court, and directed to be tried. Bearing in mind that the first probate is a mere inceptive step towards the establishment of the will, and not conclusive upon the heir or distributee, what must be taken to be the effect of this proceeding in the Court of Probates? It is manifestly a re-examination of the question of the validity of the will, and a demand upon the parties claiming under it to establish it. Can it be supposed that, notwithstanding these proceedings which the statute authorizes to impeach it, and during their pendency, it was contemplated that the executor might still proceed to deliver over to the insolvent legatees all the property bequeathed to them, and thereby place it beyond the reach of the distributees, when the will should be set aside? Certainly not; for if this were allowed, the proceeding to set aside the will might be wholly nugatory to the distributees, after a long and expensive litigation.

From the nature of the proceeding, it has the effect to suspend the execution of the will, or at least to put the executor in the position of acting, in executing it, at his peril. It is the assertion,

by the parties who are not concluded by the probate, of their rights in opposition to the will. It notifies the executor of their claim, and operates as a *lis pendens*, affecting his subsequent action. Or it is analogous to a motion for a new trial at law, allowed by the court, and reopening the matter of controversy, and devolving the *onus probandi* upon the executor, thereby treating the preliminary probate as of no force.

Such being the clear legal effect of the proceeding, it was not necessary, and therefore was not provided by the statute, that the proceedings in execution of the will should be, by express words in the statute, suspended by the making up of the issue. But that such was intended to be the effect of the proceeding is plain from the fact, that no mode is provided by law for staying proceedings in execution of the will, when it was so manifestly necessary to the protection of the rights of the distributees in such cases.

In order to test the correctness of this view, let us suppose that, after the issue is made up in the Probate Court and is pending, the legatee in the supposed will should apply to that court for an order directing the executor to pay his legacy, or deliver over the property bequeathed to him,—can it be maintained for a moment that such application should be granted? The court should not hesitate to refuse it; because the will, under which it was claimed, had been virtually suspended by the pendency of the issue impeaching it. The probate was not conclusive of the rights of the distributee, and he had taken the steps prescribed by law to compel the executor to establish the will before proceeding further to execute its provisions. Clearly, the distributee was entitled to demand in some way that his rights should not be disregarded, by the executor proceeding to treat that as a will which could have no effect in law until the issue was disposed of, and either dismissed or found in favor of the will. It is suggested that he should have obtained an injunction restraining the executor from proceeding to execute the will. If so, it shows that it was a wrong to him to proceed to carry out the will and dispose of the property to irresponsible persons, proved afterwards not to be entitled to it; and the Court of Probate is competent to take cognizance of the wrong in settling the accounts of the executor with the distributees who have been prejudiced by his conduct. But there was no necessity for either an injunction or

an order positively suspending the execution of the will; for the pending of the issue was at least a *lis pendens,* of which the executor had notice and by which he was bound, and which rendered him responsible for the wrong done to the distributees when the issue was afterwards found against the will, and it was annulled.

Hence the argument, in behalf of the appellees, that the administrator, with the will annexed, was justifiable in proceeding to execute the will pending the issue, because the probate and letters were a decree of a competent tribunal, which was final and conclusive until set aside, and a full warrant for his proceedings,— cannot be maintained. The view as to the conclusiveness of the probate upon the distributees contesting the will, is contrary to the rule held in this court, as is above shown; and the doctrine is well established, that if an executor, after probate in common form, and with notice of the invalidity of the will, dispose of the property or assets to the legatees so that it is lost to the distributees, he is responsible to them in the event that the will is afterwards set aside. *Woolley* v. *Clark,* 5 Barn. & Ald. 744; *Poag* v. *Carroll,* Dudley's Law and Eq. Rep. 4; *Hele* v. *Stovell,* 1 Ch. Cas. 126; *Ralston* v. *Telfair et al.,* 2 Dev. & Batt. Eq. 419; *Wood's Admr.* v. *Nelson,* 9 B. Munroe, 600; 10 Ib. 229.

Several authorities are relied on by the counsel for the appellees, holding that acts of an executor, before notice of the invalidity of the will, disposing of property, will be sustained, though the will be afterwards declared void; that dispositions of property by the executor to strangers, after probate of the will, they having paid the purchase-money, will not be disturbed, though the will be afterwards set aside; and sustaining acts done by the executor under a will afterwards set aside, the same being beneficial to the estate whether the will was valid or not, as receiving payment of a debt due the estate. To this effect are the cases, *Poag* v. *Carroll,* supra; *Benson* v. *Rice,* 2 Nott & McCord, 577; *Wood's Admr.* v. *Nelson,* 9 B. Munroe; *Peebles' Appeal,* 15 S. & R. 39; Toller on Exors. 75; *Hyman* v. *Gaskins,* 5 Iredell; 1 Lomax Exors. 201; 1 Wms. Exors. 406. But these cases are inapplicable to the question under consideration, which is the responsibility *of the executor* who disposes of the property in his hands under a will afterwards

set aside, and after proceedings instituted, of which he had full notice, impeaching the validity of the will.

It is contended that the administrator in this case is protected from liability, by the phraseology of the decree setting aside and annulling the will "from this day hence," the date of the decree. The verdict upon the issue was that the paper in issue was not the will of Kelly. Of course, the judgment must be understood by the verdict which it was to enforce, and could give no effect whatever to a will which was declared void. The judgment had relation to the date and time of execution of the paper, though rendered on the day of its date; and its legal effect is to annul the pretended will, to all intents and purposes. This objection is, therefore, without force.

The next question is, whether an executor or administrator, with the will annexed, has the right to charge upon the estate, or against the interest in it of the parties contesting the will, fees paid to counsel and other expenses incurred in the litigation to establish the will, if the result of the litigation be that the will is set aside.

If the will should be established by the litigation, it appears to be just that such expenses should be borne by the estate; because they would be beneficial to the parties interested; and to charge them upon the assets in the executor's hands would be but to charge them upon the parties for whose benefit the litigation was conducted, and whose interest would be promoted by the establishment of the will. But quite a different reason is applicable to the case of a litigation conducted by the executor, which results in setting aside the will. In such a case, the litigation is against the interests of the parties rightfully entitled; and the question is, whether such parties should pay the expenses of a litigation against their interest, and in which they have been successful?

We can perceive no principle of justice or rule of judicial proceeding upon which such parties should be so charged. The parties contestant are the executor and legatees, seeking to establish the will, on the one side, and the heirs at law and distributees, on the other; the affirmation of the issue being upon the former. To allow the party failing to maintain his suit, his costs and expenses against the adverse party, who was without fault, and had merely defended his just right against an unjust and unlawful claim

asserted against it, would be unknown to judicial procedure. The result of the litigation establishes that he has but defended his lawful right against an unjust claim asserted against it; and yet, under the rule contended for, he is compelled to pay not only his own expenses for counsel fees and otherwise, but those of his adversary incurred in an effort to deprive him of his rights. Such a rule would be most unjust and oppressive, and the effect of it would be, that frequently, though the heir or distributee succeeds in establishing his right, he would receive little or no benefit from the estate which belongs to him, because it would be heavily charged, if not entirely absorbed, by charges incurred by the executor in endeavoring to deprive him of it entirely. Such a rule would tend to deter heirs and distributees from contesting illegal and unjust wills; for their own expenses in the litigation, which are generally onerous in such cases, they would have to pay at all events; and if successful, their property would be charged with all the expenses of the adverse party. Thus they would certainly be compelled to bear a considerable expense on their own account, with a strong probability, if the estate was not very large, that they would ultimately receive nothing from the property to which they had established their right in the litigation. Such a controversy would not be worth pursuing.

The only reason in favor of such charges against the estate which has any force, proceeds upon the assumption that it is the duty of the executor to support the will after the first probate. This is held in the case of *Bradford* v. *Boudinot*, 3 Wash. C. C. Rep. 122; but that case appears to be founded upon the provisions of the Statute of Pennsylvania of 1791, which continued the powers of the executor and sanctions all his acts pending the contest of the will, and which is construed to impose the duty upon the executor to conduct the litigation at the expense of the estate. 1 Wms. Exors. 406, note 1 (2d edit.). But for that statute, it must be presumed that the rule would have been held differently in that case.

That it is not the imperative duty of the executor to carry on such a litigation appears to be clear from the views above stated upon the question first considered. If he have a personal interest and benefit in the estate under the will, he has an interest to sup-

port it in his individual right, and stands in the position of a lega-
tee.    But if the interest of the legatees be the subject-matter of
protection, the executor has it in his power to protect both their
interest and himself, by requiring them to employ counsel to repre-
sent their interest ; and thus the burden of supporting the will is
borne by those who claim rights under it, instead of those whose
rights are taken away by it.    The legatees, if they be adults, or
their guardians, if minors, are entirely competent to take steps to
have their rights protected, and the duty of making judicious con-
tracts to that end may be much more safely reposed in them than
in executors, who cannot be supposed to take the same interest in
making such contracts as the parties who have to pay them.    If
the legatees, upon being required, fail or refuse to employ counsel,
it is their own fault, and the executor may well decline to do so;
and rest upon the assumption that the parties apparently in inte-
rest under the will are unwilling to incur the expense of the litiga-
tion to establish it.    Thus no prejudice would be done to the parties
having the apparent interest, and the unjust result would be avoided
of charging the other parties with the expenses of a litigation car-
ried on directly to destroy their rights.

Upon this question, there is diversity of opinion in the several
State courts in which it has been presented for decision.    In Mary-
land and North Carolina, such expenses incurred by an executor
in support of a will which is set aside in the litigation, have been
held to be chargeable upon the estate.    *Compton* v. *Barnes*, 4
Gill. 55 ; *Marriner* v. *Bateman*, N. C. Rep. 350 ; *Ralston* v. *Tel-
fair et al.*, supra ; and also in the case above cited from 3 Wash.
C. C. Rep., upon the reason of the statute.    But the contrary rule
is held in several well-reasoned cases in Pennsylvania, Ohio, and
South Carolina.    *Mumper's Appeal*, 3 Watts & Serg. 441; *Boyer's
Appeal*, 13 Penn. State Rep. 569 ; *Andrews* v. *Andrews*, 7 Ohio
State Rep. 143 ; *Brown* v. *Vinyard*, 1 Bailey Eq. Rep. 461.

The rule held by these latter authorities appears to be sound,
and to be founded on the better reason ; and we have no hesitation
in giving it our sanction.

It follows that the exception in this respect should have been
sustained, so far as the distributees who contested the will or dis-
claimed any benefit under it in the suit, are concerned.    But the

legatees and distributees who were made parties to the proceeding, and answered the petition, insisting upon the validity of the will, or not disclaiming any interest under it, are liable for the expenses and costs incurred in the litigation, each for his rateable proportion, including the widow and Mary Priswood, and the proportion of each distributee so situated is chargeable upon his distributive share in the hands of the administrator.

From the foregoing views of the controlling questions presented by the record, certain conclusions follow touching the details involved in the exceptions taken to the account.

1. That the administrator is accountable for the sums of money paid by him, under the will, for the support and maintenance of Mary Priswood, to the extent of the proportions of the distributees who contested the will.

2. That he is accountable, to the same parties, for their proportion of the hire of the slave Hannah, which he permitted to remain in the possession of the widow without hire, in virtue of the will.

3. That in making distribution to the several distributees, those who have received moneys from the administrator are to be charged with the same as partial payments of their distributive shares, so as to make the share to which each of them may be entitled in the distribution, equal to the share to which each of the parties contesting the will is entitled, giving to those severally, who have received nothing, their full shares, and deducting from the shares of the others such sums as they have received from the administrator.

4. The distributees having elected, in the matter of the administrator's account, to consider him accountable for the proceeds of the plantation and slaves, instead of for rent and hire, for the purposes of the account, such proceeds must be considered as assets in his hands, and he is entitled to his legal commissions upon the same. But he is accountable to the parties who have contested the will, and have received no part of their distributive shares, for the full amount of their shares; and in paying the same, his commissions to the extent of the proportion of those distributees, which he has improperly paid to the others under the will, must be credited by that sum as so much money received by him, and due to the distributees who contested the will. In other words, he is debtor to

the estate to the amount of the proportion of the contestants of the money so misapplied, and must account for that in receiving from the contestants their proportion of his commissions. The shares of the contestants must be distributed to them without deduction for the unauthorized expenditures, and as though the administrator had all the funds thus expended in hand; and if he has not enough to pay them their shares in that mode, and his commissions, the deficiency must be charged to his commissions, so far as the proportions of the contestants are concerned.

5. The administrator should be allowed his commissions upon the sums paid out under the will; for, although improperly paid, he is yet accountable for them, and is entitled to commissions as assets in his hands. And the rate of commissions allowed in the account appears to be reasonable.

6. The evidence is sufficient to establish the reasonableness of the charges for attorney's fees in the litigation; and the exceptions of such of the appellants as did not contest the will, were properly overruled.

The decree is reversed, and the cause remanded for further proceedings, in conformity to the views herein stated.